# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**JEFF GILLMAN**

     **Plaintiff,**

**v.**              **Case No. 3:08-cv-454**
                 **Judge Thomas M. Rose**

**DOUGLAS SCHLAGETTER,** *et. al.*,

     **Defendants.**

---

### ENTRY AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 45), DENYING PLAINTIFF JEFF GILLMAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT, (Doc. 52) AND ORDERING CLERK TO STRIKE PLAINTIFF JEFF GILLMAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT. (Doc. 51).

---

   Pending before the Court are two motions: Defendants' Motion for Summary Judgment (Doc. 45) and Plaintiff Jeff Gillman's Motion for Partial Summary Judgment (Doc. 52).[1] Defendants' Motion for Summary Judgment (Doc. 45) requests that the Court grant Defendants summary judgment on Plaintiff's claim under 42 U.S.C. § 1983 for terminating Plaintiff's employment allegedly in violation of speech protections afforded by the First and Fourteenth Amendments, on Plaintiff's claim of abuse of process, on Plaintiff's claim for common law conspiracy and on Plaintiff's claim for intentional infliction of emotional distress. Motion of

---

[1] Plaintiff filed a duplicate of this motion at docket entry 51 which the Clerk will be ordered to strike.

Plaintiff for Summary Judgment (Doc. 52), by contrast, requests that the Court grant Plaintiff summary judgmet on his claim for abuse of process.

## I. Background

This case involves events concerning the termination Plaintiff Jeff Gillman's employment as a Deputy in the Shelby County Sheriff's Office. Plaintiff reported to and was supervised by Defendant Lieutenant Joanie Henry. Defendant Sheriff Doug Schlagetter supervised Lieutenant Henry. (Henry Dep. Tr. at 4.)

In the months leading up to the November 2008 Shelby County Sheriff's Election, Deputy Jeff Gillman posted on the Sidney Daily News forum under the pseudonyms "sidirect10" and "pelonis44." (Doc. 60 Ex. 1.) In the election, Gillman supported the challenger to Sheriff Doug Schlagetter and made many posts opining on the suitability of each candidate. (Doc. 60 Ex. 1, Doc. 60 Ex. 2.) On August 25, 2008, Gillman posted allegations about his supervisor, Lieutenant Henry, on the Sidney Daily News forums. (Defs.' Ex. L at 9.) On August 26, 2008, Gillman posted allegations on the forum regarding the personal life of Patty Davis, a Sheriff's Office employee with whom he was intimately involved. (Defs.' Ex. L at 5, Gillman Dep. at 186.) Upon seeing the forum post about her, Davis, posing as her husband under the name "Gilbert Narley," sent an email to Sidney Daily News Online Forum Administrator David Collins on September 13, 2008 complaining about the statements made about her and requesting the identity of "sidirect10," the username which appeared on the aforementioned comments. (Collins Aff. at 2, Davis Aff. at ¶ 2.)

Two points should be noted at this juncture. First, the Sidney Daily News forum's terms of service allowed the forum administrators to reveal users' identities "in the event of a formal complaint or legal action arising from any situation caused by...use of this forum." Second, the

Shelby County Sheriff's Office has a policy that forbids deputies from gossiping about any employee, failing to cooperate with an investigation, or publicly criticizing or ridiculing the Sheriffs' Office, its policies, personnel or supervisors.

Between September 13 and  September 15, 2008, Sidney Daily News Online Forum Administrator Collins sent the IP address of "sidirect10" to Patty Davis and banned "sidirect10." (Defs.' Ex. M at 22-23.) He also passed along his suspicions that "sidirect10" was someone within the Sheriff's Office. (Arbitration R. at 104-05.) Upon "sidirect10" being banned, Gillman began contacting Collins in an increasingly threatening manner using his other pseudonym, "pelonis44." (Collins Aff., Doc. 52 Ex. 7.)

Davis gave this IP address to Sergeant Wick, who determined that it was one of two unverified IP addresses with external access to the internal Sheriff's Office network. (Henry Dep. at 9.) By comparing the IP address provided by Collins with the list of IP addresses given external access to the Sheriff's Office network, Wick knew that the IP address belonged to one of  a "very few select people," of which Gillman was part. (Wick Dep. at 13.) At that point, to "corroborate Wick's suspicion" that Gillman was posting as "sidirect10" (Schlagetter Dep. at 129), Henry asked Wick to request a subpoena, which was granted on September 18, 2008 (Doc. 52 Ex. 4, Henry Dep. at 9, Wick Dep. at 18). The deadline for responding was set as October 3, 2008. (Doc. 52 Ex. 4.) Defendants claim that they never served the first subpoena (Schlagetter Dep. 124, Wick Dep. at 10) because of the Sheriff's concern that at that point the investigation was only "internal and not criminal" (Schlagetter Dep. at 140). Eventually, however, a subpoena was sent to WatchTV to verify the owner of the IP address used by "sidirect10." (Schlagetter Dep. at 138.)

Meanwhile, on October 2, 2008, Davis's husband had received an anonymous call claiming that Gillman and his wife were having an affair. (Henry Dep. at 18-19.) When Davis finally confessed the affair to him on the morning of October 4, 2008, he grabbed his shotgun and left. (Schlagetter Dep. at 47, Henry Dep. at 19.) He drove around for approximately 14 hours, possibly in search of Gillman, and was described as being in a "suicide by cop" mindset. (Pl.'s Ex. 8, Gillman Dep. at 199.) The report stated that Davis's husband "may be suicidal and homicidal" and later that evening, a "be on the lookout" was issued. (Pl.'s Ex. 11 at 4, Schlagetter Dep. at 60.) Around midnight, the Bellefontaine police stopped Davis's husband and turned him over to the Sheriff's Office, from which he was released shortly thereafter. (Pl.'s Ex. 8.)

Almost a month after Defendants obtained the September 18 subpoena, on October 16, 2008, Henry contacted Sidney Daily News Online Forum Administrator Collins regarding the Sheriff's Office's internal investigation of Gillman and requested that Collins provide them with posts from the forums relating to the Sheriff's election. (Collins Aff. at 9, Henry Dep. at 12.) That same day Collins came to the Sheriff's office and discussed both the forum posts and the threatening emails from "pelonis44" with the Sheriff's Office for the first time. (Henry Dep. at 12, Collins Aff. at 1.) Following the meeting with Collins, the Sheriff's Office requested a second subpoena. (Schlagetter Dep. at 124; Arbitration Record at 149; Doc. 28 at Q. 11; Henry Dep. at 10,13; Wick Dep. at 21.) The day after Collins met with the Sheriff's Office, October 17, 2008, Lieutenant O'Leary, Lieutenant Henry, and Lieutenant Henman conducted an investigatory interview with Gillman. (Henry Dep. at 15, Doc. 52 Ex. 2.) The officers asked Gillman whether he was "sidirect10," which he denied. (Gillman Dep. at 206-07.) After the interview, Gillman was placed on administrative leave.

-4-

The Sheriff's Office had a policy that required employees to direct all inquiries by the news media to the Sheriff or his designee. (Def. Ex. D.) Additionally, on September 24, 2008, Sheriff Schlagetter distributed an internal memo reminding all employees that dissemination of information to the news required prior approval. (Def. Ex. E.) Despite knowing the policy and receiving the memo, on October 18, 2008, Gillman confirmed to the Sidney Daily News facts pertaining to him regarding an October 17 story published about the behavior of Davis's husband on October 2, 2009. (Gillman Dep. at 198-99, Def. Ex. O.)

At the conclusion of the internal investigation on October 28, 2008, Sheriff Schlagetter terminated Gillman, stating as his reasons for doing so that Gillman used the Sidney Daily News online forum to demean, verbally abuse and humiliate employees of the Sheriff's Office, and that he discourteously treated Collins in threats made after Collins removed him from the online forum. (Gillman Dep. at 68-69.) On October 29, 2008, the Sheriff's Office received a response to the subpoena from WatchTV that showed Gillman as the owner of the IP address belonging to "sidirect10." (Doc. 52 Ex. 4.)

Gillman grieved his termination to an arbitrator, as allowed under his union's collective bargaining agreement. On December 8, 2009, the arbitrator found that Gillman threated Collins and that Gillman willfully demeaned, verbally abused and humiliated his coworkers by posting comments on the online forum concerning their sex lives. The arbitrator concluded that the Sheriff's Office had just cause to terminate Gillman's employment.

On December 10, 2008, Plaintiff filed suit in the United States District Court for the Southern District of Ohio, Western Division at Dayton, alleging infringement of Plaintiff's First

Amendment rights, wrongful discharge, abuse of process, conspiracy, and intentional infliction of severe emotional distress. (Doc. 2.) On February 26, 2009, Defendants filed a Motion to Dismiss (Doc. 6), which the Court granted on May 18, 2009, thereby dismissing one of his First Amendment claims, the wrongful discharge claim, and Defendant Shelby County Board of County Commissioners (Doc. 11).

After discovery was completed, both Plaintiff and remaining Defendants filed motions for summary judgment on March 1, 2010. (Doc. 45, Doc. 52.) Plaintiff requested partial summary judgment on his state law claim for abuse of process. Defendants requested summary judgment on all remaining claims, asserting qualified immunity, state statutory immunity, and lack of constitutional violation.

## II. Standard of Review

Federal Rule of Civil Procedure 56 and associated case law establishes the standard of review applicable to motions for summary judgment. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Alternatively, a court denies summary judgment "[i]f there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)). Thus, a court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits that it believes prove the absence of a genuine issue of material fact. *Id.* at 323. The burden then rests upon the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson,* 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright and Miller, *Federal Practice and Procedure* § 2726. Credibility determinations must be left to the fact-finder. *Id.*

In ruling on a motion for summary judgment, "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving

party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the Court is entitled to rely upon Rule 56 evidence specifically called to its attention by its parties.

## III. Analysis

### A. First Amendment Violation

Plaintiff's first claim asserts liability under 42 U.S.C. § 1983. To establish a § 1983 claim against an individual or a municipality, a plaintiff must identify a right secured by the Constitution or laws of the United States and the deprivation of that right by a person acting under color of state law. *Flemister v. City of Detroit,* 358 Fed. App'x. 616, 619 (6th Cir. 2009) (*citing West v. Atkins,* 487 U.S. 42, 48 (1988)). In this case, Plaintiff asserts that his First Amendment right to free speech was violated. In order to determine whether a constitutional violation of the First Amendment occurred, a plaintiff must establish three elements: "1) the plaintiff engaged in constitutionally protected speech; 2) the plaintiff was subjected to adverse action or was deprived of some benefit, and 3) the protected speech was a 'substantial' or a 'motivating factor' in the adverse action." *Brandenburg v. Hous. Auth. of Irvine,* 253 F.3d 891, 897 (6th Cir. 2001) (*citing Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

As regards the first element, a public employee must meet two standards to show his speech is constitutionally protected. The first standard is that the employee's speech "involved matters of public interest or concern." *Leary v. Daeschner,* 349 F.3d 888, 897 (6th Cir. 2003) (*citing Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1048 (6th Cir. 2001)). The second standard is that the employee's interest in addressing the public concerns must outweigh the employer's interest "in promoting the efficiency of the public services it performs through its employees." *Daeschner,* 349

F.3d at 897 (*citing Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).

### i. Matter of Public Concern

"Whether speech addresses a matter of public concern is a question of law." *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003). "To determine whether an employee's speech addresses a matter of public concern, the court must look to the 'content, form, and context of a given statement, as revealed by the whole record.'" *Hardy v. Jefferson Cmty. College*, 260 F.3d 671, 678 (6th Cir. 2001) (*citing Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

Public officials should be receptive to constructive criticism offered by their employees, but the First Amendment does not require a department to allow endless complaints over internal office affairs. *Connick*, 461 U.S. at 149. "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark -- and certainly every criticism directed at a public official -- would plant the seed of a constitutional case." *Id.* Supervisors need not "tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Id.* at 154. In the Sixth Circuit, courts should show "deference to the city's judgment on the matter of discouraging public dissension within its safety forces." *Cherry v. Pickell*, 188 Fed. App'x. 465, 469-470 (6th Cir. 2006) (*citing Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 2003)).

Other circuits have considered the question of whether speech similar to that involved in the instant case is constitutionally protected. In *Domina v. Van Pelt*, 235 F.3d 1091 (8th Cir. 2000), the Eight Circuit held that a county employee's report that he had witnessed former county road superintendent and department secretary engaged in what appeared to be a sexual act during noon

lunch hours dealt with a "matter of public concern." Part of this determination included that community was "buzzing" with rumors that superintendent and secretary were having an affair, and concern had been expressed that they were misusing county time and tax dollars on nonwork activities. *Id.* "Heightened public interest in a particular issue . . . may indicate that the issue is one of public concern." *Id.* In the instant case, this conclusion is augmented by the fact that this speech occurred in the context of an election.

The fact that protected statements have surrounded an unprotected statement does not confer protection upon the unprotected statement and immunize a public employee from discipline. *Curran v. Cousins*, 509 F.3d 36, 48 (1st Cir. 2007). Even where a court might find that there was public interest value in certain portions of a plaintiff's speech as written on an internet message board, this does not establish that there was First Amendment value in all relevant postings on the message board. *Id.* In *Curran*, a prison terminated a correctional officer from employment for a series of posts he had made on a union message board website. While the court found that some posts met the standard for First Amendment protection, offensive, unprotected statements were sufficient for creating a just cause for termination. *Id.* A court must therefore look to the First Amendment protection of all statements, and not let one statement act as a shield for all other unprotected statements.

### ii. *Pickering* Balancing Test

When a public employee's speech is found to be constitutionally protected, a Court must next balance the employee's constitutional interests against "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568; *United States v. National Treasury Employees Union*, 513 U.S. 454, 466 (1995);

*Daeschner*, 349 F.3d 888 at 899; *Rodgers v. Banks*, 344 F.3d 587, 601 (6th Cir. 2003)*; Cockrel v. Shelby County School District*, 270 F.3d 1036, 1053 (6th Cir. 2002). If an employee's private belief interferes with the discharge of his public duty, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency. *Branti v. Finkel*, 445 U.S. 507 (1980).

When balancing these interests, a court considers various factors, including whether an employee's comments: (1) meaningfully interfere with the performance of the employee's own duties; (2) undermine a legitimate goal or mission of the employer; (3) create disharmony among co-workers; (4) impair discipline by superiors; and (5) destroy the relationship of loyalty and trust required of confidential employees. *Leary*, 349 F.3d at 900; *Rodgers*, 344 F.3d at 596; *Sharp*, 285 F.3d at 486; *Cockrel*, 270 F.3d at 1053; *Meyers v. City of Cincinnati*, 934 F.2d 726, 730 (6th Cir. 1991). A court should consider the manner, time, and place of the employee's expression, and the context in which the dispute arose. *Rodgers*, 344 F.3d at 601.

In cases where there is no evidence that an employee was performing his duties in an unsatisfactory manner, there is no overriding interest that allows a government official to fire an officer who is making a political statement. *Cerjan v. Fasula*, 539 F. Supp. 1226, 1233 (N.D. Ohio 1981) (holding that a supervisor may not fire an officer who supports a rival candidate solely for his public support of that rival candidate). On the other hand, evidence that the statements may cause disruption of a police department will outweigh a First Amendment interest. *Moorer v. Copley Twp*., 98 F. Supp. 2d 838, 844 (N.D. Ohio 2000) ("Plaintiff called his superior officer, the Police Chief, a liar in public. Even if there were any First Amendment interest in Plaintiff's speech, it was minimal, and did not outweigh the threat of disruption and disharmony."). An anonymous public

statement that includes inflammatory and insubordinate comments will rarely weigh in favor of First Amendment protections, due to the likelihood of undermining department stability and cohesion. *Paquette v. City of Mason*, 250 F. Supp. 2d 840, 846 (S.D. Ohio 2002) (holding there is no First Amendment protection where an anonymous e-mail was written to the city board stating "Plaintiff's personal disapproval of the new Fire Department administration and newly implemented procedures.").

### iii. Substantial or Motivating Factor

Additionally, the Court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to fire Plaintiff. *Mt. Health City Sch. Dist. Bd. Of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). As discussed *supra,* a public employee who makes an unprotected statement is not immunized from discipline by the fact that protected statements have surrounded this statement; even if it may be reasonable to conclude government actors took an adverse action against the defendant in part due to the protected speech, the existence of unprotected speech, also grounds for the action, creates sufficient attenuation. *Curran*, 509 F.3d at 48.

### iv. Analysis of First Amendment Claim

In the instant case, while some of Plaintiff's forum posts on the message board were a matter of public concern, the Plaintiff's posts taken as a whole and in full context were not. Like the Court found in *Connick,* not all matters taking place within the sheriff's office were of public concern, and to hold that they were would allow any public employee to make unquestionably disruptive statements, such as the ones in this case. Here, like *Connick,* the sheriff's office had no duty to tolerate Plaintiff's statements that they not only reasonably construed to be statements that might

-12-

lead to a disruption within the office, but which actually did, with the Sheriff's Ofice being put on alert for Davis's husband on October 2, 2009.

As the Sixth Circuit held in *Cherry*, a court should show deference to discouraging disunity within its "safety forces" such as a sheriff's office, because a breakdown in unit cohesion can translate into a threat to public safety. When petty office drama distracts those who are responsible for protecting the community, actions taken to remove the distraction are not forbidden by the protections afforded to free speech under the First Amendment. Although Plaintiff's statements are worthy of receiving First Amendment protections outside the context of his Sheriff's Office employment, his other statements, which led a co-worker to probe who had made the comments because of their hurtful nature, were sufficiently disruptive to make his termination permissible.

The Court must balance Gillman's First Amendment right with the interests of efficient operation of a public safety organization, here, the sheriff's office. Gillman's comments created disharmony in the sheriff's office and destroyed trust between the rest of the office and Gillman. Even before they issued the subpoena, most involved in the situation inferred that Gillman was behind the comments. Gillman himself stated that his affair becoming known negatively affected office relationships. (Gillman Dep. at 212-13.) Whether or not Gillman was reckless in making the forum posts, it is indisputable from the totality of the events that a substantial disruption occurred within the sheriff's office after Gillman made the comments.

While *Cerjan* instructs this court that a supervisor may not remove a public employee from his job *solely* because of his political views, the current case is distinguishable. In *Cerjan*, a supervisor could not articulate a single reason for firing a public employee other than he had seen him wearing a jacket supporting political views that were counter to his own. In contrast, Gillman's

-13-

statements were not upsetting to his coworkers because they offered support to a rival candidate, they were upsetting and disruptive because of the very nature of the comments: speculation and rumor-milling regarding private, sexual, and embarrassing comments aimed at Gillman's coworkers. Like *Paquette,* where a plaintiff voiced personal disapproval of his office's administration, Gillman's personal disapproval led to substantial disruption among co-workers in the sheriff's office. The decision to fire Plaintiff therefore does meet the requirements to sustain a § 1983 claim. The comments here are those of a public employee concerning intra-office relations. Although Plaintiff made comments in the forum postings that were political in context, the sheriff was permitted to discharge him because the full content of the posts had an negative effect on intra-office relations. The deference to departmental efficiency under the *Pickering* test makes the action permissible.

### B. Qualified Immunity

Defendants further assert that they are not liable on Plaintiff's 42 U.S.C. § 1983 claim by virtue of qualified immunity. Qualified immunity shields a government official from liability for civil damages, and protects them from the burdens of litigation, if his conduct does not violate clearly established statutory or constitutional rights of which a "reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Saucier v. Katz,* 533 U.S. 194, 200 (2001).

When a Plaintiff asserts the defense of qualified immunity, he must establish the right allegedly violated to be established to the extent that a reasonable person in the position of the defendant would have clearly understood that he had a duty to refrain some the conduct as issue. *Washington v. Newsom,* 977 F.2d 991, 992 (6th Cir. 1992). "Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v.*

*Pelzer*, 536 U.S. 730, 739 (2002); *see also Edwards v. Gilbert*, 867 F.2d 1271, 1277 (11th Cir. 1989) ("The facts need not be the same as the facts of the immediate case. But they do need to be materially similar. Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.").

The burden is on the plaintiff to show that the official is not entitled to qualified immunity. *Smoak v. Hall,* 460 F.3d 768, 777 (6th Cir. 2006); *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir. 2006). Qualified immunity applies to mistakes of law, mistakes of fact, and mistakes based on mixed questions of law and fact. *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (citing *Butz v. Economou*, 438 U.S. 478, 507 (1978)). Courts should resolve issues of immunity at the earliest possible stage in a case to avoid unnecessary trials. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) *(citing Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

Considering the contours of the qualified immunity defense and the foregoing analysis of Plaintiff's § 1983 claim, the Court concludes that even if Plaintiff could prove the elements of § 1983 free speech claim, Defendants would still prevail on a defense of qualified immunity. The case law pointing in the favor of Defendants regarding the First Amendment rights of public employees would make it impossible to argue persuasively that his right not only existed, but that Sixth Circuit case law clearly established it and the sheriff's office should have known this.

Thus, both because the Shelby County Sheriff's Office's interest in promoting the efficiency of the service it performs takes Plaintiff's online posting out of the realm of constitutionally protected speech and because it has not been clearly established by the Untied States Court of Appeals for the Sixth Circuit nor the United States Supreme Court that it is unconstitutional for Defendants to have acted as they did, even when viewed in the best light for the Plaintiff's case, the

Court will grant Defendants' motion for summary judgment on Plaintiff's claim under 42 U.S.C. § 1983.

### C. State Statutory Immunity

Defendants also request summary judgment on Plaintiff's state law claims. Ohio Revised Code § 2744.02(A)(1) grants immunity to political subdivisions, subject only to the exceptions laid out in 2744.02(B). *Rankin v. Cuyahoga County Dep't of Children & Family Servs.*, 889 N.E.2d 521 (Ohio 2008). Additionally, Ohio law holds that a claim against an officer in his "official capacity" is simply another way of phrasing a claim against the governmental entity itself. *Norwell v. City of Cincinnati*, 729 N.E.2d 1223 (Ohio Ct. App. 1999). The Sixth Circuit has interpreted this to mean that "[i]f official-capacity claims are nothing more than claims against the county, then it would be appropriate to dismiss the official capacity claims against the employee defendants if such claims have been dismissed against the county." *Chesher v. Neyer*, 477 F.3d 784, 797 (6th Cir. 2007).

Ohio Revised Code § 2744.02(B) lists five exceptions that may strip a political subdivision of its blanket immunity: (1) the negligent operation of any motor vehicle by employees engaged within the scope of their employments; (2) the negligent performance of acts by employees engaged in proprietary functions of the political subdivision; (3) the negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads; (4) negligence of employees occurring within or on the grounds of, and due to physical defects within or on the grounds of, and due to physical defects within or on the grounds of, buildings that are used in connection with performance of a governmental function; and (5) when civil liability is expressly imposed by the Ohio Revised Code.

"Ample case law exists which holds that political subdivisions cannot be held liable for intentional torts." *Terry v. Ottawa County Board of MRDD,* 151 Ohio App. 3d 234, 238 (Ohio Ct. App. 2002) (*citing Wilson v. Stark Cty. Dept. of Human Services*, 639 N.E.2d 105 (Ohio 1994) (regarding claims for fraud and intentional infliction of emotional distress)).

None of the exceptions under Ohio Revised Code § 2744.02(B) apply to the Shelby County Sheriff's Office, and additionally they cannot be held liable for intentional torts under the aforementioned case law. Therefore, this Court will grant summary judgment on all state law claims against the Shelby County Sheriff's Office and employees thereof who have been sued in their official capacities.

### i. Employee Immunity

In their private capacities, employees of political subdivisions are also immune from liability unless, "(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or] (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code." Ohio Rev. Code § 2744.03(A)(6).

Employee Defendants are immune from suit because there is no evidence that they took their actions for any reason other than addressing the office disruption. As discussed in the § 1983 claim analysis, *supra,* employees took only permissible action, and there are therefore no exceptions to their immunity here. Assuming *arguendo,* however, that employee Defendants were not immune from suit, Plaintiff's claims would still fail for the lack of evidence regarding each individual claim as will be discussed below.

### D. Abuse of Process

To establish an abuse of process claim under Ohio law, a plaintiff must show that (1) a legal proceeding has been commenced in proper form and with probable cause; (2) the proceeding has been perverted to attempt to accomplish an ulterior motive for which it was not designed; and (3) direct damage has resulted from the wrongful use of process. *Hahn v. Star Bank*, 190 F.3d 708, 718 (6th Cir. 1999) (*quoting Yaklevich v. Kemp, Schaeffer, & Rowe Co.*, 626 N.E.2d 115 (Ohio 1994)). The Supreme Court has stated that an abuse of process includes where a party issued a subpoena for "an improper purpose," such as harassment or exerting pressure to settle a collateral dispute. *Solis v. Sign of the Beefcarver, Inc.*, 2009 U.S. Dist. LEXIS 39343 (E.D. Mich. May 8, 2009)(*quoting Powell v. United States*, 379 U.S. 48, 58 (1964)). Plaintiff's claim in the instant case is that his superiors perverted the legal process when they requested a criminal subpoena against him for use only in an internal investigation and that because of the subpoena, the sheriff terminated him from his employment.

"The key to the tort of abuse of process is the purpose for which process is used once it is issued." *Gliatta v. Tectum, Inc.*, 211 F. Supp. 2d 992, 1010 (S.D. Ohio 2002) Abuse of process will not lie for the wrongful initiation of an action but only for the improper use, or "abuse" of an action. *Gliatta*, 211 F. Supp.2d at 1010. A claim will fail "where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Yaklevich*, 626 N.E.2d at 118. Moreover, there must be "a further act in the use of process not proper in the regular course of conduct of the proceeding." *Gliatta*, 211 F. Supp.2d at 1010. Defendants must pervert or corrupt the proceeding to accomplish an ulterior purpose as the proceeding is underway; an abuse does not exist where there are merely multiple rationales for taking the action, one of which would be impermissible if independent. *Hershey v. Edelman*, 2010 Ohio 1992, 44 (Ct. App. May 6, 2010).

In *Kremer v. Cox*, 682 N.E.2d 1006 (Ohio Ct. App. 1996), the court held that a plaintiff cannot base an abuse of process claim upon the assertion that an action was improperly initiated. The court concluded that if the plaintiff had alleged that the defendant brought the suit with probable cause but that it had been then used improperly, plaintiff's abuse of process claim would have had merit. Therefore, if a criminal action is initiated at a time when there is no probable cause, a plaintiff may not bring an abuse of process claim. This element of probable cause distinguishes malicious prosecution (with its no-probable-cause element) from abuse of process (without it). *Hartman v. Moore,* 547 U.S. 250, 258 (2006) (*Comparing Heck v. Humphrey*, 512 U.S. 477 at 484, n.4 (1994) *with Baker v. McCollan*, 443 U.S. 137, 146 (1979)).

### i. Legal Proceeding with Probable Cause

The first element of the abuse of process claim requires that the subpoena satisfies the definition of "legal proceeding." Abuse of process claims "typically cover challenges to the legal action's procedural components," such as subpoenas. *Rucci v. United States I.N.S.*, 405 F.3d 45, 49 (1st Cir. 2005). While an administrative investigation for employment purposes within the sheriff's office is not a legal proceeding, the criminal subpoena represents the beginning of a criminal legal proceeding and would therefore satisfy the first necessary element.

However, when taken in the light most favorable to Plaintiff, Defendants had probable cause to issue and serve the second subpoena. While the first, unserved subpoena issued on September 18, 2008, and the second subpoena was only served after October 16, 2008, when Collins had repoted the threats against him to the Sheriff's Office. (Schlagetter Dep. at 124; Arbitration R. at 149; Doc. 28 at Q. 11; Henry Dep. at 10,13; Wick Dep. at 21.) After the meeting with Collins, Wick requested the second subpoena that they served to WatchTV and eventually resulted in the positive

-19-

confirmation of connection between Gillman and the IP address used by "sidirect10." (Doc. 52 Ex. 4.) Thus, even when favorably construing the evidence for Plaintiff's abuse of process claim, the threats against Collins formed probable cause that the Sheriff's Office used to obtain and serve a criminal subpoena, meeting one required element for an abuse of process claim.

### ii. Ulterior Motive

The second element of an abuse of process is that Defendants perverted the criminal proceeding as a means to "accomplish an ulterior motive." There is no liability for abuse of process "where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Hahn*, 190 F.3d at 718.

Here, Plaintiff alleges that Defendants used the criminal investigation to influence the discipline hearings conducted by the Sheriff's Office. Plaintiff has not offered evidence that would allow one to conclude that Defendants intended to use the criminal proceeding as a tool in the employment proceedings after Defendants legitimately began taking the necessary procedural steps to terminate Plaintiff. As discussed *supra*, the character of the subpoena controls this element too, determined by when Defendants originally requested the subpoena and thereby put the criminal investigation put into motion. If Defendants perverted it from the outset, Plaintiff's abuse of process claim must fail for the reasons outlined above regarding the distinctions between malicious prosecution and an abuse of process. If Defendants did not initially pervert the investigation, even if the Sheriff's Office had hoped to use the criminal subpoena to facilitate the firing of Plaintiff, the stated independent basis for his termination which existed prior to the subpoena's results makes this a case where the Sheriff's Office "[carried] out the process to its authorized conclusion, even though with bad intentions."

Plaintiff has failed to meet the burden required for his abuse of process claim to survive summary judgment.  Both because there was probably cause for the second subpoena to issue and because the subpoena process was never perverted to an ulterior purpose, summary judgement will be granted on Plaintiff's abuse of process claim.

### E. Intentional Infliction of Emotional Distress

A claim for intentional infliction of emotional distress requires proof of the following four elements: (1) the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it. *Ashcroft v. Mt. Sinai Medical Center*, 68 Ohio App. 3d 359 (1990). Serious emotional distress requires an emotional injury that is both severe and debilitating. *Paugh v. Hanks*, 451 N.E.2d 759 (Ohio 1983).

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20*, 453 N.E.2d 666 (Ohio 1983) (*quoting* Restatement of the Law 2d, Torts (1965) 71, Section 46). Such a case requires that an average member of the community would gasp and exclaim "Outrageous!" *Id.* There is no occasion for the law to intervene every time someone's feelings are hurt. *See* Magruder, *Mental and Emotional Disturbance in the Law of Torts*, Harv.L. Rev. 1033, 1053 (1936).

Plaintiff has not presented adequate support for his claim for intentional infliction of emotional distress. A declaration of "outrageous!" does not bring this case within the outrageousness envisioned by the Restatement of the Law as adopted in *Yeager*. The emotional distress must be severe and dehabilitating. Plaintiff has not alleged an injury to that would allow for this element to be met. (Gillman Dep. at 216-17.) Many people are fired every day, and some in circumstances much more extreme than the facts present in the current case. Even if Plaintiff's firing were improper, this itself is unfortunately not an uncommon occurrence in our culture, and hardly rises to a ghastly incident that would require a disclaimer before an anchor could recite it on the evening news. "Only the most extreme wrongs, which do gross violence to the norms of a civilized society, will rise to the level of outrageous conduct." *Brown v. Denny*, 594 N.E.2d 1008 (1991). Therefore, this Court will grant summary judgment to Defendants on the intentional infliction of serious emotional distress claim.

### F. Conspiracy

"To establish a claim of civil conspiracy, the following elements must be proven: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Nilavar v. Mercy Health System-Western Ohio*, 494 F. Supp.2d 604, 627 (S.D. Ohio 2005). A civil conspiracy claim requires that a plaintiff prove an underlying unlawful act. *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998). Because Plaintiff cannot prove an underlying unlawful act, Defendants' motion for summary judgment on the civil conspiracy claim will be granted.

### III.    Conclusion

The Shelby County Sheriff's Office's interest in promoting the efficiency of the service it performs takes Plaintiff's online postings out of the realm of constitutionally protected speech. Additionally, it has not been clearly established by the Untied States Court of Appeals for the Sixth Circuit nor the United States Supreme Court that it is unconstitutional for Defendants to have acted as they did. Similarly, Plaintiff's state law claims fail both due to statutory immunities and for want of evidence to prove essential elements. Thus, Defendants' Motion for Summary Judgment (Doc. 45), is **GRANTED**, Plaintiff Jeff Gillman's Motion for Partial Summary Judgment, (Doc. 52) is **DENIED**. The Clerk is **ORDERED** to **STRIKE** the redundant document filed as Plaintiff Jeff Gillman's Motion for Partial Summary Judgment. (Doc. 51). The instant action is hereby **TERMINATED** from the dockets of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, August 30, 2010.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE